Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue 7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

YESH MUSIC, LLC, JOHN EMANUELE,
RICHARD CUPOLO, and BRYAN EICH,

<div style="padding-left:2em">Plaintiffs,</div>

<div style="padding-left:2em">v.</div>

MEDIANET, INC. d/b/a MEDIANET DIGITAL,
INC., FRANK JOHNSON, and DOES 1-6,

<div style="padding-left:2em">Defendants.</div>
--------------------------------------------------------x

Index No.: 18-cv-3005

**COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT AND UNDERPAYMENT OF ROYALTIES**

Plaintiffs YESH MUSIC, LLC, JOHN EMANUELE, RICHARD CUPOLO, and

BRYAN EICH, by and through their attorneys at GARBARINI FITZGERALD P.C., bring this

Complaint and Jury Demand against defendants MEDIANET, INC., FRANK JOHNSON, and

DOES 1-6 based on defendants' secondary and direct infringement of plaintiffs' rights to their

copyrighted musical works pursuant to Section 106(1), 106(3) and/or 106(6) of the Copyright

Act, 17 U.S.C. §§ 101 *et seq*. (the "Copyright Act" or "Act"), and defendants' deliberate scheme

to withhold royalties owed to plaintiffs.

### NATURE OF THE ACTION

1.     This is a matter for Direct Copyright Infringement, Contributory Copyright

Infringement, Vicarious Copyright Infringement, Inducing Copyright Infringement, and Failure

to Pay Royalties.

2.      Section 106 of the Copyright Act provides the owner of a copyrighted musical work with the exclusive rights to reproduce and distribute and to authorize the reproduction and distribution of the music work in "phonorecords" (i.e., audio-only copies). 17 U.S.C. §§ 106(1), 106(3), 106(6).  Specifically, defendants at no time had any right to the compositions underlying the recordings, commonly referred to as "mechanical" rights.

3.      A party interested in reproducing and distributing the compositions embodied in the phonorecords can enter into a voluntary license with the copyright owners on terms the parties negotiate.

4.      Alternatively, under certain circumstances, a party can obtain a license under the compulsory license provisions embodied in Section 115 of the Copyright Act. 17 U.S.C. § 115. Under Section 115, once the copyright owner authorizes the first public distribution of a musical composition, a statutory license is available to others to reproduce and distribute the work to the public, provided they comply with the provisions of Section 115 requiring notice of use and accounting and payment of royalties to the copyright owner.

5.      In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA"), which amended Section 115 to clarify and confirm the rights of reproduction and distribution for sound recordings and musical compositions in the digital age.  In the DPRA, Congress recognized that a phonorecord of a musical work could be digitally reproduced and transmitted, and that copyright owners must be compensated for those activities.  Thus, Section 115 was amended to include a definition of "digital phonorecord delivery" ("DPD") as "each individual delivery of a phonorecord by digital transmission of a sound recording which results in a specifically identifiable reproduction by or for any transmission recipient of a phonorecord

of that sound recording, regardless of whether the digital transmission is also a public

performance of the sound recording or any nondramatic musical work embodied therein." 17

U.S.C. § 115(d).  Accordingly, the reproduction and distribution of musical works in the form of

DPDs is subject to licensing and payment of royalties under Section 115.

6.      Plaintiffs own the publishing rights to a combined one hundred thirty-six (136)

U.S. Copyright Registrations.  Defendants own and operate Internet based music streaming

services subject to Section 115 of the Act.

7.      Defendants reproduced, distributed, and made available to the public, plaintiffs'

copyrighted recordings, without a negotiated license, or serving a Notice of Intention to Obtain a

Compulsory License ("NOI") before the recordings were distributed.

8.      Pursuant to Section 115, defendants were required to serve an NOI, in the form

proscribed by 37 CFR § 201.18, 30 days after making plaintiffs' copyrighted recordings

available and prior to distributing them; they did not.

9.      Defendants also failed to serve any Monthly and Annual Statements of Account to

conceal the infringements and failure to pay adequate royalties.

10.     Defendants deprived plaintiffs of publishing royalties by: (i) not paying

publishing royalties on streamed recordings; (ii) deliberately deleting stream data; (iii)

deliberately deleting the run-time data for recordings over five minutes to avoid paying the

royalty multiplier; (iv) failing to provide accurate data to artists related to promotional streams,

and incomplete streams; (v) failing to serve Monthly and Annual Statements of Account to

conceal the stolen royalties, (vi) miscalculating the all-in payable royalty pool; and (vii) failing

to pay late fees.

11.     The laundry list of frauds, and misdeeds, perpetrated by the defendants shocks the

conscious.  Defendants altered records, misstated information, and systematically infringed the

copyrighted recordings of plaintiffs, while simultaneously engaging in an illegal scheme to

reduce its royalty obligations to almost nothing in violation of the Copyright Act and enacting

Regulations.

## PARTIES

12.     At all times material hereto, plaintiff Yesh Music, LLC ("YESH") was, and is, a

limited liability company organized under the laws of the State of New York, with its principal

offices located at 75-10 197th Street, Flushing, New York.  YESH is engaged in the business of

music publishing and otherwise commercially exploiting its copyrighted sound recordings of the

band The American Dollar.  Defendants exploited YESH's one hundred twenty-two (122)

copyrighted recordings in the three years prior to this Complaint without: (i) the service of any

valid NOIs, (ii) service of any Monthly Statements of Account, (iii) service of any Annual

Statements of Account, or (iv) payment of any publishing royalties, run-time multiplier royalties,

or late fees.

13.     At all times material hereto, plaintiff Richard Cupolo ("CUPOLO") was, and is,

an individual and resident of Queens.  Defendants elected to exploit CUPOLO's ten (10)

copyrighted recordings in the three years prior to this Complaint without the: (i) service of any

NOIs, (ii) service of any Monthly Statements of Account, (iii) service of any Annual Statements

of Account, or (iv) payment of any publishing royalties, time multiplier royalties, or late fees.

14.     At all times material hereto, plaintiff Bryan Eich ("EICH") was, and is, an

individual and resident of Long Island.  Defendants elected to exploit EICH's copyrighted

recordings covered by one (1) U.S. Copyright Registration in the three years prior to this

Complaint without the: (i) service of any NOIs, (ii) service of any Monthly Statements of

Account, (iii) service of any Annual Statements of Account, or (iv) payment of any publishing royalties, time multiplier royalties, or late fees.

15.     At all times material hereto, plaintiff John Emanuele ("EMANUELE") was, and is, an individual and resident of Queens.  Defendants elected to exploit EMANUELE's copyrighted recordings covered by three (3) U.S. Copyright Registrations in the three years prior to this Complaint without the: (i) service of any NOIs, (ii) service of any Monthly Statements of Account, (iii) service of any Annual Statements of Account, or (iv) payment of any publishing royalties, time multiplier royalties, or late fees.

16.     Upon information and belief, defendant MediaNet, Inc. ("MEDIANET") was, and is, a Delaware corporation with its principal place of business located at 2401 Elliot Ave. Suite Seattle, Wa 98121.  MEDIANET is a business to business licensor of certain rights in its music catalogue which it claims contains 35 million recordings.

17.     The true names and capacities of the defendants named herein as Does 1 through 6, inclusive, are unknown to plaintiffs who therefore bring suit against said defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when such have been ascertained.  Upon information and belief, each of the fictitiously named defendants herein is responsible in some manner for the occurrences herein alleged, and plaintiffs injuries as herein alleged were proximately caused by such defendants' acts or omissions.

18.     Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, Does 1-6 ("DOES 1-6") were the co-conspirators, licensees, retail distributors, agents and/or employees of MEDIANET in committing copyright infringement as alleged below.  In committing the acts described below, MEDIANET and each Doe Defendant was acting within

the course and scope of such conspiracy, license, retail distribution, agency and/or employment, and with the knowledge, consent and ratification of each of the other Defendants.

19.     Upon information and belief, defendant Frank Johnson ("JOHNSON") is the current Chief Executive Officer of defendant MEDIANET.  In his capacity as CEO of defendant MEDIANET, JOHNSON supervised and otherwise directed the infringing activities of defendant MEDIANET and has derived substantial financial benefit from defendant MEDIANET's wrongful conduct.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338 as such arise under the copyright laws of the United States, 17 U.S.C. § 101, et seq.

21.     Venue of this action is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) as a substantial part of the events giving rise to the claim occurred in this District. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(c) and 1400(a), as defendants and/or their agent may be found in this District, and because defendants are subject to personal jurisdiction in the District.

22.     Personal jurisdiction over defendants is proper in this Court on the grounds that Defendants, through their interactive web-based subscription services, caused the unlicensed distribution of the plaintiffs' copyrighted recordings throughout the State of New York, including within this Judicial District.

23.     This Court has personal jurisdiction over defendants pursuant to CPLR § 302 (New York's long-arm statute) due to their continuous and systematic business activities within New York as described below.  Defendants have conducted and do conduct business within New York.  Defendants, directly or through intermediaries (including distributors, retailers, and

others), ship, distribute, offer for sale, sell, and advertise products in the United States, and specifically to New York. Defendants purposefully and voluntarily distributed and reproduce plaintiffs' copyrighted recordings in New York.

24.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

25.     Plaintiffs have the right to bring the within action pursuant to 17 U.S.C. § 501(b).

26.     The copyright in every musical composition at issue was registered in the United States Copyright Office. 17 U.S.C. §§ 409-412.

27.     Copies of each certificate issued by the U.S. Copyright Office to the named plaintiffs are annexed and incorporated hereto respectively as **Exhibit 1.**

28.     The assignment to YESH is annexed hereto as **Exhibit 2**, and was registered with the U.S. Copyright Office.

29.     Each of the plaintiffs' copyrighted recordings was registered within three months of publication, or thirty days prior to the infringement, and satisfy the registration prerequisite under 17 U.S.C. § 412(c).

## GENERAL FACTS

30.     As a general proposition, a copyright confers on the owner the exclusive right to reproduce the copyrighted composition.

31.     Absent a license from the copyright owner, which the owner is free to grant or deny, reproduction of the composition by another constitutes copyright infringement.

32.     When Congress enacted the Copyright Act of 1909, it was concerned that exclusivity with respect to musical compositions would give rise to "a great music monopoly." It therefore modified the principle of exclusivity in the case of nondramatic musical

Compositions by enacting a compulsory license provision which, in defined circumstances, imposed upon the copyright owner a license permitting the mechanical recording of the copyrighted song "on such media as a phonograph record or a piano roll."

33.     Although recording technology has changed since 1909, licenses to record musical compositions on such media is often called "mechanical licenses."  The within Complaint refers to the "mechanical licenses" as "publishing licenses" or "publishing rights".

34.     The compulsory publishing license concept was carried forward in Section 115 of the Copyright Act of 1976 which, generally speaking, permits an entity wishing to record a copyrighted nondramatic musical Composition to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.

35.     But the availability to defendants of compulsory publishing licenses is dependent on the strict limitations of Section 115(b)(1) of the Act which requires, in pertinent part, that "[a]ny person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the Composition, serve notice of intention to do so on the copyright owner."

36.     The mere act of reproducing plaintiffs' copyrighted recordings, and making them available on defendants' services for 31 days without first serving an NOI, constitutes an infringement of plaintiffs' rights under 17 U.S.C. § 106(1),  106(2), and 106(6).

37.     Once defendant has served a valid and timely NOI, it must provide Monthly and Annual Statements of Account and pay the statutorily prescribed royalties on a monthly basis.

38.     If defendants fail to pay royalties by the 20th of the month following the month in which the streams occurred, defendants were required to pay a late fee of 1.5% per month; they did not.

39.     The content and method of service of the NOI are prescribed by statute and regulation. See 17 U.S.C. § 115(b); 37 CFR 201.18.   Defendants could have included all of the recordings submitted by each plaintiff in a single NOI.

40.     The duration of the NOI is not proscribed by rule or regulation; consequently, an industry standard two-year duration is read-into the license.

41.     Defendants intentionally failed to adhere to its Section 115 obligations, while enjoying all of the benefits afforded by Section 115.

42.     At all times relevant to this complaint, defendants failed at all times to make monthly royalty payments to plaintiffs of publishing royalties, including the run-time multiplier royalty.  At all times relevant to this complaint, defendants failed to pay any statutory late fees.

### Result of Failing to Obtain a Mechanical License

43.     When defendants make a musical composition available or distribute that composition before a publishing license is obtained, the owner(s) of the publishing rights to that musical composition (generally the artists) does not get paid.  For songwriters, like plaintiffs, whose recordings are not played on the radio, the royalties earned from streaming revenue is often substantially the largest part of their income.

44.     Moreover, making available and reproducing a musical composition without a license for the publishing rights is copyright infringement under 17 U.S.C. § 501, and may not be cured after the fact by attempting to obtain a compulsory license. See Section 115 ("failure to serve or file an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement . . .".)

45.     The August 4, 1995, United States Senate Report, *Digital Performance Right in Sound Recordings Act of 1995*, confirms:

>    Of course, a digital transmission service would be liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner:

Senate Report No. 104- 128, S. Rep. 104-128 (1995) at 27 (emphasis added).

46.     The United States Senate Report further states:

>    If a record company grants a license under its rights in the sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, **it is the transmission service's responsibility to obtain a license under the musical work copyright**.

Senate Report No. 104-128, S. Rep. 104-128 (1995) at 31(emphasis added).

### GENERAL FACTS SPECIFIC TO EACH PLAINTIFF

**YESH MUSIC, LLC**

47.     YESH is the beneficial owner of the publishing rights (a/k/a mechanical rights or composers rights) to, inter alia, one hundred and twenty-two (122) copyrighted recordings by assignment.

48.     Defendant MEDIANET reproduced, distributed, and made available to the public YESH's one hundred and twenty-two (122) copyrighted recordings on its service located at www.mndigital.com.

49.     Defendant MEDIANET also distributed YESH's one hundred and twenty-two (122) copyrighted recordings to DOES 1-6, who also copied, distributed, and made available plaintiffs' copyrighted recordings to the public.

50.     YESH's recordings were purportedly streamed on defendant MEDIANET's, and presumably its client's (DOES 1-6), service 12,805 in the United States for the period December

2013 through January 2018. See **Exhibit 3**.

51.     Defendant MEDIANET served one NOI on YESH covering twenty (20) recordings in February 2018.

52.     The NOI is facially invalid because it fails to state a date of service as required by 37 CFR 201.18(d)(iv) which states: "The fiscal year of the person or entity intending to obtain the compulsory license.  If that fiscal year is a calendar year, the Notice shall state that this is the case".

53.     All dates were excluded from the NOI to hide the facial invalidity.  Section 115 clearly states:

> "(1) Any person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the work, serve notice of intention to do so on the copyright owner. If the registration or other public records of the Copyright Office do not identify the copyright owner and include an address at which notice can be served, it shall be sufficient to file the notice of intention in the Copyright Office. The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.
>
> (2) Failure to serve or file the notice required by clause (1) forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509."

54.     The YESH NOI was served years after defendants reproduced, distributed, and made the copyrighted recordings available to the public.  The NOI is also facially invalid for this reason.

55.     Defendant failed to serve NOIs for One hundred and two (102) of YESH's copyrighted recordings.

56.     At no time did defendants pay YESH any publishing royalties or late fees for any of defendants' services.

57.     At no time did defendants pay YESH any time-multiplier royalties or late fees for any of defendants' services.

58.     At no time did defendants serve an Annual Statement of Account on YESH as required by 37 CFR 210.17.

59.     At no time did defendants serve a Monthly Statement of Account on YESH as required by 37 CFR 210.16.

60.     YESH had no way of knowing the fact that defendants were exploiting its recordings.

61.     Only in December 2017, when YESH did a search for MEDIANET on the TuneCore artist interface, did it learn that defendants were exploiting his copyrighted recordings.

62.     Pursuant to 17 U.S.C. § 501, defendants infringed YESH's exclusive rights to all one hundred and twenty-two (122) of YESH's copyrighted recordings.  Defendants acts of infringement were obviously intentional under 17 U.S.C. § 504(c).

**BRIAN EICH**

63.     EICH is the beneficial owner of, inter alia, one (1) U.S. Copyright Registration covering thirteen recordings. See **Exhibit 1**.

64.     Defendant MEDIANET reproduced, distributed, and made available to the public EICH's copyrighted recordings on its service located at www.mndigital.com.

65.     Defendant MEDIANET also distributed EICH's copyrighted recordings to DOES 1-6, who copied, distributed, and made available to the public EICH's copyrighted recordings.

66.     EICH's recordings were streamed on defendant MEDIANET's service and the services of DOES 1-6 for the three years prior to the filing of this Complaint.

67.     Defendant failed to serve NOIs for any of EICH's recordings.

68.     At no time did defendants pay EICH any publishing royalties or late fees for any of defendants' services.

69.     At no time did defendants pay EICH any time-multiplier royalties or late fees for any of defendants' services.

70.     At no time did defendants serve an Annual Statement of Account on EICH as required by 37 CFR 210.16.

71.     At no time did defendants serve a Monthly Statement of Account on EICH as required by 37 CFR 210.17.

72.     EICH had no way of knowing the fact that defendants were exploiting his copyrighted recordings.

73.     In April 2018, when EICH did a search for MEDIANET on the CD Baby artist interface, he first learned that defendants were exploiting his copyrighted recordings.

74.     Pursuant to 17 U.S.C. § 501, defendants infringed EICH's exclusive rights to his copyrighted recordings.  Defendants acts of infringement were obviously intentional under 17 U.S.C. § 504(c).

**JOHN EMANUELE**

75.     EMANUELE is the beneficial owner of, inter alia, three (3) U.S. Copyright Registrations covering one hundred and sixty-four (64) recordings. See **Exhibit 1**.

76.     Defendant MEDIANET reproduced, distributed, and made available to the public EMANUELE's copyrighted recordings on its service located at www.mndigital.com.

77.     Defendant MEDIANET also distributed EMANUELE's copyrighted recordings to DOES 1-6, who copied, distributed, and made available to the public EMANUELE's copyrighted recordings.

78.     EMANUELE's copyrighted recordings were purportedly streamed on defendant MEDIANET's service and the services of DOES 1-6 eighty-seven (87) times in the three years prior to the filing of this Complaint.

79.     Defendant failed to serve NOIs for any of EMANUELE's recordings.

80.     At no time did defendants pay EMANUELE any publishing royalties or late fees for any of defendants' services.

81.     At no time did defendants pay EMANUELE any runtime-multiplier royalties or late fees for any of defendants' services.

82.     At no time did defendants serve an Annual Statement of Account on EMANUELE as required by 37 CFR 210.16.

83.     At no time did defendants serve a Monthly Statement of Account on EMANUELE as required by 37 CFR 210.17.

84.     EMANUELE had no way of knowing the fact that defendants were exploiting his recordings.

85.     In April 2018, when EMANUELE did a search for MEDIANET on the TuneCore artist interface, he first learned that defendants were exploiting his copyrighted recordings.

86.     Pursuant to 17 U.S.C. § 501, defendants infringed EMANUELE's exclusive rights to his three U.S. Copyright Registrations.

87.     Defendants acts of infringement were obviously intentional under 17 U.S.C. § 504(c).

**RICHARD CUPOLO**

88.     CUPOLO is the beneficial owner of, inter alia, ten (10) U.S. Copyright Registrations covering ten (10) recordings. See **Exhibit 1**.

89.     Defendant MEDIANET reproduced, distributed, and made available to the public CUPOLO's copyrighted recordings on its service located at www.mndigital.com.

90.     Defendant MEDIANET also distributed CUPOLO's copyrighted recordings to DOES 1-6, who copied, distributed, and made available to the public CUPOLO's copyrighted recordings.

91.     CUPOLO's copyrighted recordings were purportedly streamed on defendant MEDIANET's service, and the services of DOES 1-6, eighty-five (85) times in the three years prior to the filing of this Complaint. See **Exhibit 4**.

92.     Defendant failed to serve NOIs for any of CUPOLO's recordings.

93.     At no time did defendants pay CUPOLO any publishing royalties or late fees for any of defendants' services.

94.     At no time did defendants pay CUPOLO any time-multiplier royalties or late fees for any of defendants' services.

95.     At no time did defendants serve an Annual Statement of Account on CUPOLO as required by 37 CFR 210.16.

96.     At no time did defendants serve a Monthly Statement of Account on CUPOLO as required by 37 CFR 210.17.

97.     CUPOLO had no way of knowing the fact that defendants were exploiting his recordings.

98.     In April 2018, when CUPOLO did a search for MEDIANET on the TuneCore artist interface, did he learn that defendants were exploiting his copyrighted recordings.

99.     Pursuant to 17 U.S.C. § 501, defendants infringed CUPOLO's exclusive rights to his ten (10) U.S. Copyright Registrations.

100.     Defendants acts of infringement were obviously intentional under 17 U.S.C. § 504(c).

**FACTS SPECIFIC TO DEFENDANTS**

**MEDIANET**

101.     MEDIANET was originally founded as MusicNet in 1999 to operate a subscription music service, which began operation in 2001.  In the spring of 2005, it was acquired by Baker Capital, and in 2006 and changed its name to MEDIANET.

102.     MEDIANET provides and operates a proprietary technology platform that supports the digital delivery of music and other media.  MEDIANET advertises that its service delivers "a set of powerful music and media content capability including streams, downloads, media search, contextual matching and other media discovery tools to engage end users while keeping them on your web site or application longer to maximize revenues."

103.     MEDIANET, at least in part, "licenses" its music catalog to third-party Internet music services for a fee.  At different times throughout MEDIANET's existence, said music catalog has been housed on either MEDIANET's computer servers or copied onto its customers' computer servers.

104.     In addition to providing music to third-parties, MEDIANET either currently operates or previously operated an Internet music subscription and non-subscription service known as "Performer Digital".

105.     Performer Digital, in part, allows/allowed consumers to listen to the entire sound recording of a user-selected musical work via "On-Demand Streams", which is generally defined as on demand real time digital transmissions of sound recordings using so-called streaming technology.

106.     Performer Digital, also in part, allows/allowed consumers, either during a free

trial period or upon payment of a monthly fee to MEDIANET, the ability to download an unlimited number of sound recordings of musical works from MEDIANET's computer server(s) via "Limited Downloads" (a/k/a "Tethered Download" or "Conditional Downloads"), which is generally defined as the making and distribution of sound recordings by digital transmission to local storage devices (e.g., the hard drive of a user's computer or portable devices) via time limited or use limited downloads.

107.    On information and belief, Limited Downloads remain on the consumer's computer hard drive as long as the free trial period is in effect or the subscriber pays/paid to MEDIANET the monthly subscription fee.

108.    Additionally, MEDIANET allows users of its corporate website (located at www.mndigital. corn) to purchase permanent digital copies of recorded music directly from MEDIANET for $0.99 per song (users can also purchase entire albums digitally directly from MEDIANET).

109.    MEDIANET's customers operate a variety of different types of music services, including, but not limited to, subscription and non-subscription music services (similar to Performer Digital) as well as so-called internet radio services.

110.    MEDIANET is not a "service provider" as defined by 17 U.S.C. § 512 and therefore not entitled to any of the safe harbor provisions of the Digital Millennium Copyright Act.

111.    In order to lawfully transmit, perform, reproduce and deliver any sound recording of any musical work via "On-Demand Stream" or "Limited Download" on Performer Digital or its corporate website, MEDIANET must have first obtained not only a license for each individual sound recording itself from the owner(s) of each sound recording, but also a separate license for

the underlying musical composition which is embodied on each separate sound recording from the copyright owner of said musical composition.

112.    Likewise, in order for any of MEDIANET's music service customers to lawfully transmit, perform, reproduce or deliver any sound recording of any musical work via "On Demand Streams" or "Limited Downloads" from the MEDIANET catalog, the licenses required by MEDIANET, as stated in the preceding paragraph, must have been assignable to third parties. The licenses for the underlying musical compositions embodied on each of the aforementioned sound recordings could have been obtained either via a voluntary license (with the consent of the copyright holder) or via a compulsory license, the method of which is set forth in 17 U.S.C. § 115 and related regulations of the Copyright Office.

113.    However, pursuant to 17 U.S.C. § 115, failure to serve or file the notice required prior to distribution forecloses the possibility of a compulsory license and, in the absence of a negotiated (voluntary) license, renders the making and distribution of phonorecords actionable as acts of infringement.

114.    A license obtained under the compulsory provision of the Copyright Act, being non- exclusive in nature, is not assignable.

115.    Defendant failed to serve NOIs for all of plaintiffs' recordings.

116.    At no time did MEDIANET pay plaintiffs any publishing royalties or late fees.

117.    At no time did MEDIANET pay plaintiffs a time-multiplier royalty or late fees.

118.    At no time did MEDIANET serve an Annual Statement of Account on plaintiffs as required by 37 CFR 210.16.

119.    At no time did MEDIANET serve a Monthly Statement of Account on plaintiffs as required by 37 CFR 210.17.

**DOES 1-6**

120.    DOES 1-6 are yet to be identified companies responsible in some manner for the occurrences herein alleged, and plaintiffs' injuries as herein alleged were proximately caused by such defendants' acts or omissions.

121.    Upon information and belief, MEDIANET assigned the rights to plaintiffs' master recordings to DOES 1-6 who then copied, distributed, and offered to the public plaintiffs' copyrighted recordings.

122.    At no time did DOES 1-6 serve an NOI for the publishing rights to any of plaintiffs' copyrighted recordings.

123.    Defendant failed to serve NOIs for all of plaintiffs' recordings.

124.    At no time did DOES 1-6 pay plaintiffs any publishing royalties or late fees.

125.    At no time did DOES 1-6 pay plaintiffs a time-multiplier royalty or late fees.

126.    At no time did DOES 1-6 serve an Annual Statement of Account on plaintiffs as required by 37 CFR 210.16.

127.    At no time did DOES 1-6 serve a Monthly Statement of Account on plaintiffs as required by 37 CFR 210.17.

**FRANK JOHNSON**

128.    Upon information and belief, Frank Johnson ("JOHNSON") is the current Chief Executive Officer of defendant MEDIANET.

129.    In his capacity as CEO of Defendant MEDIANET, JOHNSON supervised and otherwise directed the infringing activities of Defendant MEDIANET and has derived substantial financial benefit from Defendant MEDIANET's wrongful conduct.

## THE INFRINGEMENTS

130.    Plaintiff YESH is the sole legal or beneficial owner of the following musical work(s):

| Title of Work | Artist | US Registration Number |
| --- | --- | --- |
| A Few Words | The American Dollar | SR0000713230 |
| A Few Words (Ambient) | The American Dollar | SR0000713735 |
| A Long Goodbye | The American Dollar | SR0000713763 |
| Age of Wonder | The American Dollar+B87 | SR0000713231 |
| Age of Wonder (Ambient) | The American Dollar | SR0000713737 |
| Age of Wonder (Live) | The American Dollar | SR0000677646 |
| Anything You Synthesize | The American Dollar | SR0000713287 |
| Anything You Synthesize (Ambient) | The American Dollar | SR0000713314 |
| As We Float | The American Dollar | SR0000708480 |
| As We Float (Ambient) | The American Dollar | SR0000708466 |
| Bump | The American Dollar | SR0000713282 |
| Bump (Ambient) | The American Dollar | SR0000713301 |
| Call | The American Dollar | SR0000713281 |
| Cambian | The American Dollar | SR0000708510 |
| Chase | The American Dollar | SR0000713291 |
| Chillpoint Break | The American Dollar | SR0000708528 |
| Circuits | The American Dollar | SR0000713237 |
| Circuits (Ambient) | The American Dollar | SR0000713745 |
| Clones | The American Dollar | SR0000713238 |
| Clones (Live) | The American Dollar | SR0000677646 |
| Crossing Asia | The American Dollar | SR0000708486 |
| Crossing Asia (Ambient) | The American Dollar | SR0000708465 |
| Daytrip | The American Dollar | SR0000708497 |
| DEA | The American Dollar | SR0000713226 |
| Dea (Ambient) | The American Dollar | SR0000713303 |

| Distance to Gibralter | | |
|---|---|---|
| Equinox | The American Dollar | SR0000713239 |
| Equinox (Ambient) | The American Dollar | SR0000713747 |
| Escapist | The American Dollar | SR0000713278 |
| Ether Channels | The American Dollar | SR0000708489 |
| Ether Channels (Ambient) | The American Dollar | SR0000708538 |
| Everyone Gets Shot | The American Dollar | SR0000708504 |
| Faces In The Haze | The American Dollar | SR0000708492 |
| Faces in the Haze (Ambient) | The American Dollar | SR0000708494 |
| Faces in the Haze (Film Edit) | The American Dollar | SR0000708458 |
| Fade In Out | The American Dollar | SR0000713232 |
| Fade in out (Ambient) | The American Dollar | SR0000713739 |
| Fade In Out (Live) | The American Dollar | SR0000677646 |
| Falls | The American Dollar | SR0000708427 |
| Far Adrift | The American Dollar | SR0000708460 |
| First Day | The American Dollar | SR0000708490 |
| First Day (Ambient) | The American Dollar | SR0000708540 |
| A Memory Stream | The American Dollar | SR0000713277 |
| Flood (Ambient) | The American Dollar | SR0000713752 |
| Friends of Friends | The American Dollar | SR0000708477 |
| Friends of Friends (Ambient) | The American Dollar | SR0000708463 |
| Frontier Melt | The American Dollar | SR0000713276 |
| Ghosts | The American Dollar | |
| Glow | The American Dollar | SR0000708511 |
| Heavy Eyes Ignite | The American Dollar | SR0000708491 |
| Heavy Eyes Ignite (Ambient) | The American Dollar | SR0000708473 |
| Intermission | The American Dollar | SR0000713283 |
| Intro | The American Dollar | SR0000713290 |
| Landing (Ambient) | The American Dollar | SR0000713756 |
| Lights Dim | The American Dollar | SR0000713284 |
| Lights Dim (Ambient) | The American Dollar | SR0000713321 |
| Long March | The American Dollar | SR0000713217 |

| | | |
|---|---|---|
| Near East (2010 Unreleased Bonus Track) | The American Dollar | SR0000713764 |
| Near East (Ambient) | The American Dollar | SR0000713755 |
| Neighborhood | The American Dollar | SR0000713444 |
| Oil and Water | The American Dollar | SR0000713234 |
| Oil and Water (Ambient) | The American Dollar | SR0000713743 |
| Oil and Water (Live) | The American Dollar | SR0000677646 |
| Oracle | The American Dollar | SR0000708475 |
| Oracle (Ambient) | The American Dollar | SR0000708467 |
| Our Hearts Are Read | The American Dollar | SR0000713286 |
| Palestine | The American Dollar | SR0000713228 |
| Par Avion | The American Dollar | SR0000708493 |
| Par Avion (Ambient) | The American Dollar | SR0000708470 |
| Paragon | The American Dollar | SR0000708421 |
| Pause | The American Dollar | SR0000708473 |
| Peterson | The American Dollar | SR0000713220 |
| Raided By Waves | The American Dollar | SR0000713227 |
| Red Letter | The American Dollar | SR0000713235 |
| Red Letter (Ambient) | The American Dollar | SR0000713746 |
| Rudiments of A Spiritual Life | The American Dollar | SR0000708503 |
| Rudiments of a Spiritual Life (Ambient) | The American Dollar | SR0000713307 |
| Rudiments of A Spiritual Life (Live) | The American Dollar | SR0000677646 |
| Sands | The American Dollar | SR0000708461 |
| Second Sight | The American Dollar | SR0000713241 |
| Second Sight (Ambient) | The American Dollar | SR0000713749 |
| Second Sight (Live) | The American Dollar | SR0000677646 |
| Separate But Equal | The American Dollar | SR0000713218 |
| Shadows | The American Dollar | SR0000713233 |
| Shadows (Ambient) | The American Dollar | SR0000713740 |
| Signaling Through The Flames | The American Dollar | SR0000708500 |
| Signaling Through the Flames (Ambient) | The American Dollar | SR0000713308 |

| | | |
|---|---|---|
| Signaling Through the Flames (Film Edit) | The American Dollar | SR0000713318 |
| Somnambulance | The American Dollar | SR0000708508 |
| Starscapes | The American Dollar | SR0000713289 |
| Starscapes (Ambient) | The American Dollar | SR0000713297 |
| Steeltown (Ambient) | The American Dollar | SR0000708541 |
| Steeltown (Part One) | The American Dollar | SR0000708536 |
| Steeltown (Part Two) | The American Dollar | SR0000708488 |
| Strings | The American Dollar | SR0000708487 |
| Strings (Ambient) | The American Dollar | SR0000708472 |
| Summer Of War | The American Dollar | SR0000713225 |
| Supernova Landslide | The American Dollar | SR0000713223 |
| The Slow Wait (Part 1) | The American Dollar | SR0000713279 |
| The Slow Wait (Part 1) (Ambient) | The American Dollar | SR0000713311 |
| The Slow Wait (Part 2) | The American Dollar | SR0000713280 |
| The Slow Wait (Part 2) (Ambient) | The American Dollar | SR0000713313 |
| The Slow Wait (Part One) (Live) | The American Dollar | SR0000677646 |
| The Slow Wait (Part Two) (Live) | The American Dollar | SR0000677646 |
| The Swamp | The American Dollar | SR0000713222 |
| The Technicolour Sleep | The American Dollar | SR0000708501 |
| Thompson | The American Dollar | SR0000713221 |
| Time | The American Dollar | SR0000713224 |
| Time (Ambient) | The American Dollar | SR0000713315 |
| Time (Film Edit) | The American Dollar | SR0000713319 |
| Tonight, Let's All Make Love In London | The American Dollar | SR0000708499 |
| Transcendence | The American Dollar | SR0000713285 |
| Transcendence (Ambient) | The American Dollar | SR0000713316 |
| Twelve Days Awake | The American Dollar | SR0000708514 |
| Underground | The American Dollar | SR0000708457 |
| Urbana | The American Dollar | SR0000708478 |
| Urbana (Ambient) | The American Dollar | SR0000708464 |

| War On Christmas | The American Dollar | SR0000708513 |
| We're Hitting Everything | The American Dollar | SR0000713288 |
| We're Hitting Everything (Ambient) | The American Dollar | SR0000713305 |
| Where We Are (Ambient) | The American Dollar | SR0000713759 |

131.    YESH is the exclusive holder of all rights granted by 17 U.S.C. § 106 in and to the musical works referenced above.

132.    The musical works referenced above have been registered with the United States Copyright Office.

133.    Upon information and belief, without YESH's authorization or permission, defendants have copied, displayed, performed and distributed to their customers and to the public, via "On-Demand Streams" and "Limited Downloads" through the Performer Digital service referenced above, and through DOES 1-6 music services, YESH's copyrighted recordings.

134.    EMANUELE is the exclusive holder of all rights granted by 17 U.S.C. § 106 in and to the musical works:

| Title of Work | Artist | US Registration Number |
| --- | --- | --- |
| Zero Bedroom Apartment 2005-2010 Releases | Zero Bedroom Apartment | SR 677-965 |
| 2014 Zero Bedroom Apartment Cues | Zero Bedroom Apartment | SRu 1-169-865 |
| Filmmusik 3 | Zero Bedroom Apartment | SruA1:C130 1-111-713 |

135.    EMANUELE is the exclusive holder of all rights granted by 17 U.S.C. § 106 in and to the musical works referenced above.

136.   The musical works referenced above have been registered with the United States Copyright Office.

137.   Without EMANUELE's authorization or permission, defendants have copied, displayed, performed and distributed to their customers and to the public, via "On-Demand Streams" and "Limited Downloads" through the Performer Digital service referenced above, and through DOES 1-6 music services, EMANUELE's copyrighted recordings.

138.   EICH is the exclusive holder of all rights granted by 17 U.S.C. § 106 in and to the musical works in the album Sleeping By A Wire, U.S. Copyright Registration SRu 661-941.

139.   EICH's musical works have been registered with the United States Copyright Office.

140.   Without EICH's authorization or permission, defendants have copied, displayed, performed and distributed to their customers and to the public, via "On-Demand Streams" and "Limited Downloads" through the Performer Digital service referenced above, and through DOES 1-6 music services, EICH's copyrighted recordings.

141.   CUPOLO is the exclusive holder of all rights granted by 17 U.S.C. § 106 in and to the musical works:

| Title of Work | Artist | US Registration Number |
|---|---|---|
| Whirlwind | Richard Cupolo | SRu 1-113-046 |
| The Grand Adventure | Richard Cupolo | SRu 1-113-043 |
| The World Without Us | Richard Cupolo | SRu 1-113-044 |
| Speaking of You | Richard Cupolo | SRu 1-113-041 |
| Sense of Truth | Richard Cupolo | SRu 1-113-052 |
| Riot Bloom | Richard Cupolo | SRu 1-113-054 |
| Distant Mystic | Richard Cupolo | SRu 1-113-053 |
| Canyons | Richard Cupolo | SRu 1-179-976 |
| Bermuda | Richard Cupolo | SRu 1-113-049 |

| Animal Chemistry | Richard Cupolo | SRu 1-113-047 |

142.    The musical works referenced above have been registered with the United States Copyright Office.

143.    Without CUPOLO authorization or permission, defendants have copied, displayed, performed and distributed to their customers and to the public, via "On-Demand Streams" and "Limited Downloads" through the Performer Digital service referenced above, and through DOES 1-6 music services, CUPOLO's copyrighted recordings.

**CONTINUED INFRINGEMENTS**

144.    Defendants continue to copy, display, perform and distribute plaintiffs' copyrighted recordings, without plaintiffs' authorization or permission, thereby further infringing plaintiffs' exclusive rights.

145.    Defendants had knowledge at the time it copied, displayed, performed and distributed plaintiffs' copyrighted musical compositions, that defendants were required to obtain authorization via a license from plaintiffs or procure the aforementioned statutory compulsory license prior to any use of plaintiffs' copyrighted musical compositions.

146.    Defendants further had knowledge that they are barred from obtaining a statutory compulsory license, having failed to send proper notice prior to distribution.

147.    Defendants made plaintiffs' copyrighted musical compositions available to MEDIANET's customers and the general public without any compensation to plaintiffs.

148.    Absent a license to transmit, perform, reproduce and deliver the musical compositions embodied on each specific sound recording in the MEDIANET catalog that is or has been distributed via Performer Digital, the MEDIANET corporate website or otherwise via "license" from MEDIANET to its customers, each such transmission, performance, reproduction

and delivery constitutes copyright infringement.

149.     Absent an assignable license to transmit, perform, reproduce and deliver the musical compositions embodied in each specific sound recording in the MEDIANET catalog, not only MEDIANET, but each of MEDIANET's customers identified as DOES 1-6, have subsequently transmitted, performed, reproduced and delivered said musical composition have also committed copyright infringement.

150.     MEDIANET and its customers, having no license (voluntary or compulsory) from plaintiffs for the use of their copyrighted musical works as described herein, have committed copyright infringement.

151.     Defendants have knowledge that infringing activities are taking place through MEDIANET's business dealings and method of operation.

152.     Defendants have further facilitated, encouraged and contributed to MEDIANET's customers' infringement of plaintiffs' copyrighted musical compositions through Performer Digital and its customers' internet music services, all as generally described herein.

153.     Defendants have derived direct and substantial financial benefits from the infringements of plaintiffs' copyrighted musical compositions by MEDIANET's customers, DOES 1-6.

154.     By allowing the infringing activities of its customers, MEDIANET earns a fee or percentage of revenue from its customers' infringing activities.

155.     MEDIANET has the ability to control the infringement of Plaintiffs' copyrighted musical compositions by its customers and their users/subscribers.

156.     Defendant JOHNSON has the ability to control the infringement of plaintiffs' copyrighted musical compositions by MEDIANET's customers and their users/subscribers.

157.   MEDIANET's infringements of Plaintiffs' copyrighted musical works, and the infringements of MEDIANET' customers, has been a continuing infringement, dating back in some instances to the initial launch in 2001.

### FIRST CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
### (Against all Defendants)

158.   Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

159.   Defendants have, without a license for the publishing rights from plaintiffs, reproduced, made available to the public, and distributed plaintiffs' copyrighted compositions through their interactive web-based subscription streaming products.

160.   It cannot be disputed that the plaintiffs have valid, registered copyrights and own the publishing rights to their copyrighted compositions.  Defendants reproduced and offered the copyrighted compositions for streaming, including permanent and temporary digital download, without a license for the publishing rights, thus infringing plaintiffs' rights under Section 115 of the Copyright Act.  Irreparable injury is presumed here as plaintiffs have established a prima facie case of copyright infringement.

161.   Even after defendants were put on notice in previous actions, defendants elected to continue to reproduce and publicly perform and/or publicly distribute plaintiffs' copyrighted compositions.

162.   The making or the distribution, or both, of all copyrighted compositions without the payment of proper royalties and late fees is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

163.   Each time plaintiffs were deprived of their statutory royalty entitlement, e.g., by

non-payment of royalties and late fees, a distinct harm was done to plaintiffs' property interest.

164.     Defendants' predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages.  Defendants knew that their actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

165.     Defendants' knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiffs' rights (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

166.     As a direct and proximate result of each of the defendants' infringements, plaintiffs have incurred damages, as described more fully above. Pursuant to 37 C.F.R. § 385, plaintiffs are entitled to a "per stream" statutory royalty rate of $.01 for interactive web-based streaming services like Defendants.

167.     Plaintiffs may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each registration which has been infringed.

## SECOND CLAIM FOR RELIEF
## CONTRIBUTORY AND VICAROUS INFRINGEMENT
### (Against Defendants MEDIANET AND JOHNSON)

168.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

169.     Defendants MEDIANET and JOHNSON had knowledge of the infringing activity, and induced, caused or materially contributed to the infringing conduct of defendants DOES 1-6.

170.     Defendant MEDIANET and JOHNSON had the right and ability to supervise the

infringing activity and also has a direct financial interest in the activity.

171.     Plaintiffs have been damaged, and defendants MEDIANET and JOHNSON have been unjustly enriched, in an amount that is not as yet fully ascertained but which plaintiffs are informed and believe is not less than $150,000 according to proof at trial.

### THIRD CLAIM FOR RELIEF
### CONTRIBUTORY INFRINGEMENT
#### (Against All Defendants)

172.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

173.     Through its conduct alleged herein, MEDIANET knowingly and systematically induced, caused, materially contributed to and participated in the infringing reproduction and/or distribution of plaintiffs copyrighted compositions, including in the form of DPDs, by its business partners and end users.

174.     Each unauthorized reproduction and/or distribution of a composition constitutes a separate and distinct act of infringement.

175.     MEDIANET's conduct has been and continues to be intentional, willful and with full knowledge of Plaintiffs copyrights in the Compositions and the infringement thereof.

176.     Defendants had explicit and constructive knowledge that said infringements are taking place and actively induces, facilitates, causes and materially contributes to said infringements.

177.     As a result of the foregoing, defendants are liable for contributorily infringing plaintiffs' copyrighted recordings, in violation of Sections 106 and 501 of the Copyright Act.

178.     Each act of copyright infringement referenced herein was willful within the meaning of 17 U.S.C. 101, *et seq.*

179.     Plaintiffs have suffered economic damage and irreparable harm as a result of the

continuing acts of infringement referenced herein, and unless and until defendants' conduct is enjoined by this Court, defendants will continue to cause irreparable injury that cannot fully be compensated for or measured in money, and plaintiffs are accordingly entitled to an injunction pursuant to 17 U.S.C. § 502 prohibiting further infringement of their exclusive rights under the Copyright Act.

180.    The forgoing constitutes contributory infringement.

181.    Plaintiffs are entitled to, at their election, either their actual damages and defendants' profits from the infringing activities described herein, or, in the alternative, statutory damages pursuant to 17 U.S.C. § 101, *et seq.*

182.    Plaintiffs are further entitled to their attorneys' fees and costs pursuant to 17 U.S.C. § 505.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**VICARIOUS INFRINGEMENT**
**(Against All Defendants)**

</div>

183.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set for that length herein.

184.    Defendant JOHNSON is the Chief Executive Officer of MEDIANET.

185.    Through its conduct alleged herein, MEDIANET had the right and ability to control the infringing reproduction and/or distribution of plaintiffs' copyrighted recordings, including in the form of DPDs, by its business partners and end users.

186.    MEDIANET received and continues to receive a direct financial benefit from the infringing reproduction and/or distribution of plaintiff's copyrighted recordings, including in the form of DPDs, by its business partners and end users.

187.    Each unauthorized reproduction and/or distribution of a recording constitutes a

separate and distinct act of infringement.

188.    MEDIANET's conduct has been, and continues to be, intentional, willful and with full knowledge of plaintiffs' copyrights in the recordings and the infringement thereof.

189.    The foregoing acts constitute vicarious infringement of plaintiffs' recordings.

190.    As a result of the foregoing, defendants are liable for vicariously infringing plaintiffs' copyrighted musical compositions, in violation of Sections 106 and 501 of the Copyright Act.

191.    Each instance whereby each separate sound recording embodying a copyrighted recording owned by plaintiffs was copied, displayed, performed and/or distributed by MEDIANET's customers or their users/subscribers constitutes' a separate act of copyright infringement and a separate violation of 17 U.S.C. 101, *et seq.,* for which defendants are liable.

192.    Defendants' customers and their users/subscribers are actively infringing plaintiffs' copyrighted musical compositions, as set forth herein, which infringes upon plaintiffs' exclusive rights secured by 17 U.S.C. § 106.

193.    Defendants have derived direct and substantial financial benefits from the infringements of plaintiffs' copyrighted musical compositions by their customers and their users/subscribers, as described herein.

194.    Defendants have the legal right and actual ability to supervise, control and prevent the infringing activities that occur through their customers' services, but have failed and or refused to exercise any control over the infringing activities.

195.    Each act of infringement referenced herein was willful within the meaning of 17 U.S.C. 101, *et seq.*

196.    Plaintiffs are entitled to, at their election, either their actual damages and defendants' profits from the infringing activities described herein, or, in the alternative, statutory damages

pursuant to 17 U.S.C. § 101, *et seq.*

197.     Plaintiffs are further entitled to their attorneys' fees and costs pursuant to 17

U.S.C. § 505.

## FIFTH CLAIM FOR RELIEF
## FAILURE TO PAY ROYALTIES
### (Against All Defendants)

198.     Plaintiffs reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs with the same force and effect as if fully set for that length

herein.

199.     As described herein, defendants systematically shorted the publishing royalties

and late fees owed to plaintiffs.

200.     Defendants have failed to pay plaintiffs any run-time multiplier or late fees.

201.     Plaintiffs have been damaged, and defendants have been unjustly enriched, in an

amount to be determined at trial

## FIFTH CLAIM FOR RELIEF
## INDUCING COPYRIGHT INFRINGEMENT
### (Against all Defendants)

202.     Plaintiffs reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs with the same force and effect as if fully set for that length

herein.

203.     MEDIANET has, through its clear expression and other affirmative steps as

alleged herein, actively promoted, encouraged and induced its business partners and end users to

infringe plaintiffs' copyrighted recordings.

204.     Each unauthorized reproduction and/or distribution of a recording constitutes a

separate and distinct act of infringement.

205.    MEDIANET's conduct has been and continues to be intentional, willful and with full knowledge of Plaintiff's copyrights in the Compositions and the infringement thereof

206.    The foregoing acts constitute inducing infringement of plaintiffs' copyrighted recordings.

207.    Pursuant to 17 U.S.C. § 504(c), as a direct and proximate result of MEDIANET's vicarious infringement of plaintiffs' copyrighted recordings, plaintiffs are entitled to recover up to $150,000 in statutory damages for each recording infringed.  Alternatively, at plaintiffs' election, pursuant to 17 U.S.C. § 504(b), plaintiff shall be entitled to their actual damages, including MEDIANET's profits from infringement, as will be proven at trial.

208.    Plaintiffs are also entitled to recover her attorney's fees and costs pursuant to 17 U.S.C. § 505 and prejudgment interest according to law.

209.    MEDIANET is causing, and unless enjoined by the Court, will continue to cause, plaintiffs irreparable harm for which plaintiffs have no adequate remedy at law.  Plaintiffs are entitled to an injunction under 17 U.S.C. § 502 prohibiting the continued infringement of their recordings and an order under 17 U.S.C. § 503 directing the impoundment, destruction or other reasonable disposition of all infringing phonorecords and copies of such recordings.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for relief against defendants as follows:

1.    Enter judgment in favor of plaintiffs;

2.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of plaintiffs (17 U.S.C. § 502), including enjoining defendants from continued copyright infringement and violations of the relevant provisions of the Copyright Act;

3.    For an order imposing a constructive trust over those monies obtained by defendants as a result of their violations of the Copyright Act;

4.      For an order directing the impoundment of other reasonable disposition of all infringing phonorecords and copies of copyrighted musical works owned or controlled by plaintiffs;

5.      A temporary, preliminary, and permanent injunction enjoining and restraining defendants, and their respective agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliates, companies, successors, assigns, and those acting in concert with them or at their direction, from further violations;

6.      Injunctive relief that requires defendants pay for the services of a third party auditor to identify the owners of all works reproduced and/or distributed by defendants despite defendants' failure to first obtain a mechanical license prior to reproducing and/or distributing plaintiffs copyrighted recordings, and further requiring defendants to remove all such unlicensed tracks from its services until it obtains proper licenses for them;

7.      Restitution of defendants' unlawful proceeds, including defendants' gross profits;

8.      Award compensatory damages to plaintiffs in an amount to be ascertained at trial;

9.      Award statutory damages to plaintiffs according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

10.     Award reasonable attorneys' fees and costs (17 U.S.C. § 505);

11.     Award plaintiffs pre- and post-judgment interest to the extent allowable; and,

12.     Award plaintiffs all unpaid royalties, time-multiplier royalties, and late fees.

13.     Award such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: April 5, 2018                                    **GARBARINI  FITZGERALD P.C.**

                                                        By: _Richard M. Garbarini_____
                                                            Richard M. Garbarini (RG 5496)